UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

H-D MICHIGAN, LLC and
HARLEY-DAVIDSON MOTOR COMPANY,
INC.,

                                                            Case No. 2:11-cv-00742-LA

          Plaintiffs,

          v.

HELLENIC DUTY FREE SHOPS S.A.,

          Defendant.

_____

### MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO MODIFY AND DISSOLVE TEMPORARY RESTRAINING ORDER

_____

Hellenic Duty Free Shops S.A. ("DFS"), appearing specially and without waiving its objections to personal jurisdiction, respectfully moves for an Order (i) modifying the Temporary Restraining Order issued September 6, 2011 (the "TRO") so that it requires Plaintiffs to give security payable in Athens, Greece in an amount not less than €1,800,000; and (ii) dissolving the TRO insofar as it prevents DFS from re-selling certain autumn-winter 2011-2012 HARLEY-DAVIDSON goods that were made and sold to DFS by Harley-Davidson-approved factories and imported by DFS into the European Union with Plaintiffs' full knowledge and approval.

### FACTS

DFS is a corporation organized and existing under the laws of Greece. Declaration of Emmanouil Zachariou, sworn to October 26, 2011 (hereinafter, "Zachariou Decl.") ¶¶ 1-2 & Ex. 1. DFS has no presence in the United States and has never entered into any written agreement with either Plaintiff. *Id.* ¶¶ 34-44.

1

Prior to April 22, 2011, DFS contracted to purchase a substantial quantity of autumn-winter HARLEY-DAVIDSON clothing and accessories (the "AW 2011-2012 Goods") from various Harley-Davidson-approved factories. *Id.* ¶¶ 3-10 & Exs. 2-4. Harley-Davidson had expressly approved the designs and pre-production samples of the AW 2011-2012 Goods in multiple meetings held in London, England and in written communications issued between June 2010 and January 2011. *Id.* ¶¶ 5-7 & Ex. 4.

DFS exhibited and offered the AW 2011-2012 Goods for wholesale sale at the Harley-Davidson Global Dealers Meeting held in Kissimmee, Florida between February 2 and 5, 2011. *Id.* ¶ 8. Harley-Davidson-approved factories subsequently sold and shipped the AW 2011-2012 Goods to DFS in Greece, where the goods were received by DFS in July 2011. *Id.* ¶ 15. In terms of their materials and quality of construction, the AW 2011-2012 Goods were similar or identical to those of HARLEY-DAVIDSON goods that DFS's former subsidiary, Elmec Sport S.A., had sold in Europe for many years prior to 2011. *Id.* ¶ 9.

In the meanwhile, on April 22, 2011, Harley-Davidson had purported to terminate a trademark license agreement dated January 1, 2010 (the "January 2010 Agreement") that the Plaintiffs had entered into with DFS's former subsidiary, Elmec Sport S.A.[1] The stated justification for Harley-Davidson's action was DFS's supposedly "unauthorized" sale of certain

---

[1] A copy of the January 2010 Agreement appears in Exhibit 1 to the Declaration of Matt Thompson, sworn to August 12, 2011 ("Thompson Decl."). Article 14 of the January 2010 Agreement provided in part: "This Agreement and all rights and obligations hereunder are personal to Licensee and may not be assigned, sublicensed, encumbered, or otherwise transferred, in whole or in part, by Licensee [Elmec Sport S.A.] without the prior written consent of Licensor [Harley-Davidson Motor Company, Inc.] . . . . Any attempt by Licensee [Elmec Sport S.A.] to do any of the foregoing shall be void *ab initio* . . . ." Thompson Decl. ¶ 14 & Ex. 1 at 27. *Cf. Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 435-40 (6th Cir. 2009) (merger of related corporations did not result in transfer of copyright license to surviving corporation, where license required licensor's express written consent). The record contains no "prior written consent" of Harley-Davidson Motorcycle Company, Inc. to any assignment, transfer, or sublicense of any part of the January 2010 Agreement to DFS.

HARLEY-DAVIDSON "Essentials Collection" goods to a German retail distributor called "Penny Market." Zachariou Decl. ¶¶ 11-132 & Exs. 5-6. The disputed "Essentials Collection" formed no part of the AW 2011-2012 Goods. *Id.* ¶ 13.

By letter dated July 21, 2011, Harley-Davidson was informed that the disputed goods sold to Penny Market had been withdrawn from the market. Declaration of James W. Dabney, sworn to October 27, 2011 (hereinafter, "Dabney Decl.") ¶ 2 & Ex. 1. DFS suggested a meeting in London to work out an orderly wind-down of the business. *Id.* But Harley-Davidson, having terminated its business relationship with DFS as suddenly and precipitously as it did, found itself needing or wanting more than an orderly wind-down of business relations with DFS. Harley-Davidson wanted certain confidential DFS commercial information that would be valuable to a new licensee, but that Harley-Davidson had no lawful way to extract from DFS.

Harley-Davidson demanded that DFS provide it with, among other things, a list of DFS customers that had purchased HARLEY-DAVIDSON goods and a detailed breakdown of DFS's sales of such goods to each customer, including unit sales and volume by currency. Zachariou Decl. ¶ 11 & Ex. 5 at p. 4 (citing terminated, non-surviving § 6.1 of the January 2010 Agreement); Thompson Decl. ¶ 34 & Ex. 7 (repeating demand for detailed DFS customer information in letters dated May 26 and June 23, 2011). When DFS declined to volunteer its customer list and related data (Dabney Decl. ¶ 2 & Ex. 1), Harley-Davidson initiated a series of steps that had the effect, and were clearly intended, to put pressure on DFS that might induce DFS to meet Harley-Davidson's extra-contractual demands.

On July 26, 2011, in response to a routine submission of production samples of AW 2011-2011 Goods, Harley-Davidson sent an e-mail to DFS that stated in part: "*We are not sure why* you sent us the two proforma-invoices and photos for production samples for season A113

because Harley-Davidson terminated the License Agreement effective April 22, 2011. Accordingly, *Elmec should not* be designing, manufacturing, *promoting, selling, or distributing* these products. . . ." Zachariou Decl. ¶ 18 & Ex. 10 (emphasis added).

Harley-Davidson's assertion that DFS purportedly "should not be . . . selling" the AW 2011-2011 Goods was legally baseless[2] but, on the surface, threatened to bring about a total loss of the value of the AW 2011-2012 Goods. Zachariou Decl. ¶¶ 19-22. By letter dated July 28, 2011, DFS declined to give in to Harley-Davidson's renewed demands for customer data but once again offered to meet in person to resolve the matter. Thompson Decl. ¶ 35 & Ex. 8. Harley-Davidson then filed this lawsuit on August 5, 2011.

Harley-Davidson did not at first seek any emergent injunctive relief against DFS. In a letter to the undersigned dated August 8, 2011, Harley-Davidson's counsel enclosed a copy of its lawsuit complaint, renewed its prior requests for customer and other DFS information, and further stated: "Harley-Davidson is *willing* to *withdraw* its *previous disapproval* of the production samples for the Fall/Winter 2011 items that DFS submitted to Harley-Davidson for approval on July 22, 2011." Dabney Decl. ¶ 3 & Ex. 2. In fact, there had been no "disapproval" of production samples, but merely an arbitrary refusal to receive DFS's proffer of such samples.

Four days later, on August 12, 2011, Harley-Davidson moved for issuance of a Temporary Restraining Order and a Preliminary Injunction. The question thus naturally arises:

---

[2] Under applicable European Union and Greek law, any trademark rights that Harley-Davidson had in the AW 2011-2012 Goods were "exhausted" when Harley-Davidson-approved factories sold and delivered those goods to DFS. Declaration of Alexandros Kalantzis, sworn to October 27, 2011 (hereinafter, "Kalantzis Decl.") ¶ 4. United States law is to similar effect. *See, e.g., Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 621 (2008) ("For over 150 years this Court has applied the doctrine of patent exhaustion to limit the patent rights that survive the initial authorized sale of a patented item"); *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61-62 (2d Cir. 1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner").

What had changed, between April 2011 and August 2011, that suddenly prompted Harley-Davidson file suit and seek the extraordinary remedy of an *ex parte* temporary restraining order? The now expanded record strongly suggests, if it does not compel, the inference that Harley-Davidson's motion for Temporary Restraining Order was filed in bad faith, and for the improper purpose of attempting to set up an "essentially extortionate transaction." *Youngs v. Old Ben Coal Co.*, 243 F.3d 387, 393 (7th Cir. 2001) (Posner, J.). If Harley-Davidson could secure a TRO blocking DFS's sale of the AW 2011-2012 Goods, Harley-Davidson would then be in a position to threaten to destroy the entire value of the AW 2011-2012 Goods if DFS did not give in to Harley-Davidson's informational demands.

Harley-Davidson's motion for Temporary Restraining Order did not mention the AW 2011-2012 Goods and did not present evidence or argument that stopping DFS's re-sale of those particular goods would yield any benefit to the Plaintiffs. Instead, Harley-Davidson told the court a story that Harley-Davidson knew was untrue, that DFS was supposedly engaged in ongoing sales of "inexpensive, lower-quality Unauthorized Products" through "unauthorized distribution channels" including "Penny Market." Plaintiffs' Memorandum in Support of Motion for a Temporary Restraining Order and Preliminary Injunction (hereinafter, "Pltf. Mem.") at 16.[3]

Although justifying its application for emergency relief by referring to supposedly threatened or ongoing sales of "Unauthorized Products" through "unauthorized distribution channels," the terms of the Temporary Restraining Order that Harley-Davidson submitted to the court were not limited to any such allegedly injurious activity. Rather, Harley-Davidson asked the court to issue a sweeping order that would restrain DFS from selling *any* HARLEY-

---

[3] Plaintiffs' motion for Temporary Restraining Order used the capitalized term "Unauthorized Products" to refer to a specific group of products that DFS had sold to a German retailer called "Penny Market" for the spring-summer 2011 season. Pltf. Mem. at 10. The goods sold to Penny Market were entirely distinct from the AW 2011-2012 goods. Zachariou Decl. ¶ 13.

5

DAVIDSON goods to *any* distributor, regardless of the origin of the goods and regardless of the Plaintiffs' prior approval of the goods' manufacture and sale to DFS. As these Plaintiffs clearly knew (and failed to inform the court), the terms of their proposed Temporary Restraining Order were plainly designed to prevent DFS from selling the AW 2011-2012 Goods.

Having purchased the AW 2011-2012 Goods from Harley-Davidson-approved factories and imported those goods into the European Union with these Plaintiffs' full knowledge and approval (Zachariou Decl. ¶¶ 3-10 & Exs. 2-4), DFS no more needed these Plaintiffs' "approval" to re-sell the AW 2011-2012 Goods in the EU than a terminated appliance dealer might need a manufacturer's "approval" to re-sell genuine goods purchased from the manufacturer's own authorized factory. *See* note 2 *supra*. To the extent that DFS had any *contractual* obligation to provide production samples of AW 2011-2012 goods to Harley-Davidson, the expanded record now shows that Harley-Davidson waived or willfully frustrated the performance of any such obligation (Zachariou Decl. ¶¶ 16-18 & Exs. 8-10) and at all events, "the only proper remedy for a harmless breach is nominal damages." *Youngs*, 243 F.3d at 392.

On September 6, 2011, without opposition and before DFS was even arguably subject to the court's jurisdiction,[4] the court issued the subject TRO having five decretal paragraphs that were identical to those that the Plaintiffs had sought in their motion for a Temporary Restraining Order. Reflecting the pretextual nature of the Plaintiffs' Motion for Temporary Restraining Order, the TRO did not include any findings that the the manufacture or sale of the AW 2011-2012 Goods to DFS was "unauthorized," or that DFS's sale of the AW 2011-2012 Goods would constitute any form of legal injury to these Plaintiffs under applicable European trademark law.

---

[4] "An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, *and brought under a court's authority, by formal process.*" *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc*., 526 U.S. 344, 347 (1999) (emphasis added).

The terms of the TRO, however, were worded so broadly as to sweep far beyond any activity that was brought to the court's attention, and prohibited DFS's sales of *genuine* HARLEY-DAVIDSON goods, including the AW-2011-2012 Goods, whose sale to DFS had been specifically authorized and approved by Plaintiffs. Harley-Davidson published the TRO to European distributors and took active steps to induce DFS vendees to break their contracts to purchase AW 2011-2012 Goods from DFS. Zachariou Decl. ¶¶ 24-25 & Exs. 11-12. Under Federal Rule of Civil Procedure 65(c), Harley-Davidson must now live with the consequences of its actions.

The accompanying declaration of DFS's Deputy Chief Executive Officer, Emmanouil Zachariou, details economic losses that the TRO has already caused DFS to suffer. The losses fall into three basic categories: (i) loss of 70% of the value of the now outdated AW 2011-2012 Goods; (ii) exposure to claims by distributors for non-delivery of AW 2011-2012 Goods; and (iii) loss of profits from the operations of a HARLEY-DAVIDSON retail store that the TRO literally ordered DFS to close. Zachariou Decl. ¶ 3 & Ex. 2, ¶¶ 26-33 & Exs. 13-14. These losses come to an estimated €1,788,785.50 (approximately USD $2,493,084), not counting the impact of the TRO on DFS's business reputation and its relations with employees whose jobs were eliminated by the TRO.

The brown paper on the windows of the now empty HARLEY-DAVIDSON clothing store in Glyfada, Greece (Zachariou Decl. ¶ 27 & Ex. 13) and the empty shelves where genuine HARLEY-DAVIDSON merchandise was sold next door to a DFS HARLEY-DAVIDSON motorcycle dealership (Zachariou Decl. ¶ 27) is perhaps the most dramatic demonstration of the impact of the TRO on real people's lives, and its *negative* impact on whatever goodwill these Plaintiffs think they have in Greece.

The TRO has caused injury to DFS's business for which Harley-Davidson must now post bond under Rule 65(c); and this is so even if the court were now to ameliorate the situation and vacate the TRO on a prospective basis. Nothing can now be done to change the past, but vacatur of the TRO would enable DFS to salvage at least some of the value of the AW 2011-2012 Goods and mitigate the injuries that the TRO has caused to date.

## SUMMARY OF THE ARGUMENT

Federal Rule of Civil Procedure 65(c) provides that a temporary restraining order may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In this case, the $10,000 security specified in the TRO is grossly inadequate to pay the costs and damages that the TRO has caused DFS to sustain. The TRO should be modified to direct the Plaintiffs to post security of at least €1,800,000 (approximately USD $ 2,553,191). Zachariou Decl. ¶¶ 29-33. Further, as the TRO purports to be operative in Greece, any security posted by Plaintiffs should also be reachable by DFS in Greece (Part I, *infra*).

In addition to requiring Plaintiffs to give security adequate to pay the costs and damages that DFS has suffered to date, the Court should immediately dissolve the TRO insofar as it purports to restrain DFS from selling the AW 2011-2011 Goods. Vacatur of the TRO is appropriate because (i) Plaintiffs have failed to demonstrate that DFS is subject to personal jurisdiction in this court; (ii) Plaintiffs have failed to demonstrate that sale of the AW 2011-2012 Goods would constitute any legal injury to the Plaintiffs; (iii) Plaintiffs have failed to demonstrate that they would lack legal remedies, such as royalty damages, in the unlikely event that they were to succeed in establishing that DFS breached some contractual undertaking to Plaintiffs; and (iv) DFS is likely to succeed in demonstrating that, insofar as Plaintiffs have

sought to prevent sale of the AW 2011-2012 Goods, the Plaintiffs come to this court with unclean hands and seek injunctive relief that would be highly inequitable in the circumstances.

## ARGUMENT

### I. THE COURT SHOULD MODIFY THE TRO TO REQUIRE PLAINTIFFS TO GIVE SECURITY OF AT LEAST €1,800,000 REACHABLE IN GREECE.

"The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002).

"Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond." *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007) (citing *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000)). A bond amount set too low may cause "irreparable injury" to the enjoined party. *Mead Johnson*, 201 F.3d at 888 ("bonds must reflect full costs" of the enjoined party).

Although DFS respectfully submits that the court lacks personal jurisdiction and the TRO conspicuously *did not* adopt the contrary proposed finding in the Plaintiffs' application for a Temporary Restraining Order, DFS has complied with the TRO as set forth in the accompanying Declaration of Emmanouil Zachariou. Since Harley-Davidson failed to tell the court about the AW 2011-2012 Goods or the circumstances leading up to DFS's receipt of those goods in July 2011 (Zachariou Decl. ¶¶ 3-23 & Exs. 2-10), the court was misled into believing that the requested TRO would cause only "minor harm" to DFS. TRO at 4.

In fact, as Harley-Davidson well knew, the terms of the TRO were designed and intended to put at risk an entire season's worth of genuine HARLEY-DAVIDSON goods that

9

DFS had contracted to purchase prior to April 22, 2011 (Zachariou Decl. ¶ 9),[5] and that Harley-Davidson-approved factories sold and delivered to DFS in July 2011. *Id.* ¶ 15. The expanded record now shows that the TRO has caused approximately €1,800,000 in economic losses to DFS's business and property. First, the AW 2011-2012 Goods have lost an estimated 70% of their €972,815 value, for a total of €680,970.50 lost. Zachariou Decl. ¶ 30. Second, DFS is exposed to customer claim, arising from non-delivery of AW 2011-2012 Goods, totalling an additional €972,815. *Id.* ¶ 32. Finally, the TRO ordered DFS to stop selling *any* HARLEY-DAVIDSON apparel and resulted in the unplanned closure of DFS's HARLEY-DAVIDSON apparel store, resulting in estimated lost profits of €135,000. *Id.* ¶ 31.

As the TRO purports to restrain the operation of DFS's business in Greece, to be meaningful, any letter of credit or other security given by Harley-Davidson must also be reachable in Greece. Especially given DFS's objection to the Court's personal jurisdiction, a bond given by a United States domestic security is inadequate in the circumstances. Harley-Davidson does business throughout the world and can readily post security in Greece if directed by the Court do so. Further, for a well capitalized company like Harley-Davidson, the cost of posting security is nominal relative to the costs of this litigation and the economic injuries that the TRO has caused and threatens to cause to DFS's business and property.

Harley-Davidson's contention that it supposedly is likely to succeed on the merits of its breach of contract claim against DFS is irrelevant to the amount of security that Rule 65(c) requires be posted. Security under Rule 65(c) is required for the contingency that a party awarded interim injunctive relief turns out, in the end, not to have been entitled to such relief, no

---

[5] Although the January 2010 Agreement is not binding on DFS, it may be noted that Section 11.1 of that Agreement expressly authorized the manufacture of HARLEY-DAVIDSON goods to fill orders taken prior to any termination thereof.

matter how "likely" a contrary conclusion may have appeared prior to trial. If Harley-Davidson eventually establishes that it was entitled to the TRO that it received, then it will never have to pay for the damages that the TRO caused. The likelihood of such an outcome is extraneous and irrelevant to the determination of the size of the security that Rule 65(c) requires, which is measured by the impact of a TRO on an enjoined party.

Equally meritless is Harley-Davidson's suggestion, raised during the October 17 telephone conference, that its unliquidated damage claim against DFS can somehow constitute "security" for damages that the TRO has caused to DFS. The undersigned is aware of no case in which a plaintiff's disputed claim for money damages has ever been deemed "security" within the meaning of Rule 65(c) such that the claim's potential foregiveness could operate to reduce the amount of security that the rule requires be posted.

In sum, and regardless of whether the TRO is vacated on a prospective basis, Federal Rule of Civil Procedure 65(c) requires that the TRO be modified to require Plaintiffs to give security in an amount adequate to indemnify DFS against the losses that the TRO has caused it to suffer. Plaintiffs should be ordered forthwith to give security, reachable in Greece, in an amount of not less than €1,800,000 (or approximately USD $ 2,553,191 as of October 27, 2011).

## II.    THE COURT SHOULD DISSOLVE THE TRO.

The court should vacate the TRO for at least the following reasons: (i) Plaintiffs have failed to demonstrate that the court has personal jurisdiction over DFS; (ii) Plaintiffs have failed to demonstrate that DFS's sale of the AW 2011-2012 Goods would invade any legally protected interest of the Plaintiffs; (iii) Plaintiffs have failed to demonstrate that they lack adequate legal remedies for any supposed breach of contract by DFS with respect to the AW 2011-2012 Goods; and (iv) the Plaintiffs have acted inequitably with respect to the AW 2011-2012 Goods; the TRO was clearly sought in support of a failed "hold up" attempt; the TRO has inflicted severe injury

on DFS while yielding no benefit to the Plaintiffs whatsoever; and in the circumstances, the terms of the TRO are inequitable, unfair, and unjust. These points are treated severally below.

### A. Plaintiffs Have Not Shown That the Court has Personal Jurisdiction.

The complaint in this action asserts but a single claim for alleged breach of contract and invokes the court's diversity jurisdiction under 28 U.S.C. § 1332(a). Under Federal Rule of Civil Procedure 4(k)(1), the court has personal jurisdiction over DFS only if Wisconsin state law would authorize service of a summons on DFS in Attica, Greece with respect to the contract claim purportedly stated in the Plaintiffs' complaint.

In seeking the TRO, the Plaintiffs did not even argue that the Wisconsin Long Arm Statute, Wis. Stat. § 801.05, authorized service of a summons on DFS with respect to the contract claim purportedly stated by Plaintiffs. No claim is made, or could be made that DFS has a "local presence or status" in Wisconsin (§ 801.05(1)); that the Plaintiffs' claim arises under any Wisconsin statute that purports to confer grounds of personal jurisdiction (§ 801.05(2)); that the Plaintiffs' claim arises out of an act or omission "within this state by the defendant" (§ 801.05(3)); that at the time of Plaintiffs' alleged injury, "[s]olicitation or service activities were carried on within this state by or on behalf of the defendant" or "[p]roducts, materials or things processed, serviced or manufactured by the defendant were used or consumed within this state in the ordinary course of trade" (§ 801.05(4)); that DFS undertook "to perform services within this state or to pay for services to be performed in this state" (§ 801.05(5)), or that any other provision of Wis. Stat. § 805.05 applies to the Plaintiffs' purported claim.

Instead, the Plaintiffs assert that DFS purportedly *consented* to personal jurisdiction in this court with respect to Plaintiffs' claim. The sole basis of Plaintiffs' jurisdictional contention is the January 2010 Agreement (Thompson Decl. ¶ 14 & Ex. 1) which Plaintiffs entered into with DFS's former subsidiary, Elmec Sport S.A. Plaintiffs assert that DFS was "formerly known

12

as Elmec Sport S.A." (Thompson Decl. ¶ 14), suggesting that DFS and Elmec Sport S.A. were and are one and the same legal entity, with the purported result that the January 2010 Agreement supposedly embodies a contract between Plaintiffs and DFS.

In fact, DFS was never "known as" Elmec Sport S.A.; DFS is, and always has been, an entirely distinct and different corporate entity from the "Elmec Sport S.A." entity that formerly was a party to the Elmec License. Zachariou Decl. ¶ 2 & Ex. 1. On December 30, 2010, the former Elmec Sport S.A. entity assigned certain of its *assets* to DFS in a Greek statutory merger transaction (*id*.), but the assigned assets did not include the January 2010 Agreement.

Article 14 of the January 2010 Agreement provided in part:

This Agreement and all rights and obligations hereunder are personal to Licensee and may not be assigned, sublicensed, encumbered, or otherwise transferred, in whole or in part, by Licensee without the prior written consent of Licensor, which consent shall be in Licensor's sole and exclusive discretion. . . . Any attempt by Licensee to do any of the foregoing shall be void ab initio and shall constitute a material breach of this Agreement.[6]

On its face, the January 2010 Agreement was "personal" to Elmec Sport S.A. and could not be "assigned, sublicensed, encumbered, or otherwise transferred" to DFS or anyone else, "in whole or in part," without the "prior written consent of" Harley-Davidson. Plaintiffs have presented no evidence that they provided "prior written consent" to any transfer of the January 2010 Agreement, in whole or in part, to DFS.

In seeking to sue DFS in this court, the Plaintiffs apparently seek to rely on a purported transfer or assignment of the January 2010 Agreement to DFS that never occurred or, if attempted, was void *ab initio*. *Cf. Cincom*., 581 F.3d at 435-40 (merger of related corporations did not result in transfer of copyright license to surviving corporation, where license required licensor's express written consent). Plaintiffs effectively ask the court to disregard the plain

---

[6] Thompson Decl. ¶ 14 & Ex. 1 at 27.

terms of Article 14 of the January 2010 Agreement, and to treat that agreement as if DFS were a party to it, which it is not.

As the January 2010 Agreement, on its face, is not and, by its express terms, cannot be a contract between Plaintiffs and DFS, the January 2010 Agreement cannot constitute any agreement by DFS waive objections to this court exercising personal jurisdiction contrary to the terms of Federal Rule of Civil Procedure 4(k)(1). The TRO should be vacated on this ground alone.

**B.  Plaintiffs Have Failed to Demonstrate That Sale of the AW 2011-2012 Goods Would Invade Any Legal Interest of the Plaintiffs.**

As set forth in the accompanying Declaration of Emmanouil Zachariou, the AW 2011-2012 Goods were purchased by DFS from Harley-Davidson-approved factories, were made in accordance with Harley-Davidson-approved specifications, and were imported by DFS into the European Union with these Plaintiffs' full knowledge and authorization. Any trademark rights that Plaintiffs may have had in the AW 2011-2012 Goods were "exhausted" by their authorized sale to DFS and could not be a basis for preventing DFS's re-sale of those goods within the European Union. Kalantzis Decl. ¶ 4. This legal reality presumably explains the glaring absence from the Plaintiffs' complaint of any claim that sale of the AW 2011-2012 Goods infringes any trademark rights that Harley-Davidson may have under the laws of any European Union country, and Plaintiffs' exclusive reliance on a breach of contract theory. *Cf. Quanta*, 553 U.S. at 621 (authorized sale of goods embodying patented invention "exhausts" patent rights to control re-sale); *Polymer*, 975 F.2d at 61-62 (authorized sale of goods bearing trademark "exhausts" trademark rights to control re-sale).

Plaintiffs' motion for Temporary Restraining Order did not mention the AW 2011-2012 Goods and presented no evidence that DFS's sale of those genuine, fully authorized goods would

invade any trademark rights of Plaintiffs or cause any harm to Plaintiffs whatsoever. The expanded record now shows, to the contrary, that the AW 2011-2012 Goods were designed, made, and sold to DFS with Harley-Davidson's full knowledge and approval. The sole basis of any objection Harley-Davidson might have to DFS's re-sale of the AW 2011-2012 Goods is Harley-Davidson's own willful decision to refuse to receive production samples that DFS proffered to Harley-Davidson in July 2011. Zachariou Decl. ¶¶ 16-18 & Exs. 3, 8-10. Harley-Davidson's willful refusal to receive production samples is, in the circumstancs, no evidence that sale of the AW 2011-2012 Goods would cause any harm to Harley-Davidson, and in fact supports a conclusion that Harley-Davidson had no reason to think that DFS would sell any goods that would harm DFS's own very good reputation. *See* Zachariou Decl. ¶ 2 & Ex. 1 (2010 Annual Report describing business of DFS and DFS affiliates).

To the extent, moreover, that the January 2010 Agreement was personal to Elmec Sport S.A. and non-assignable or transferrable, as Article 14 of the January 2010 Agreement expressly provides, then Harley-Davidson has no basis for arguing that DFS's sale of the AW 2011-2012 Goods breaches any duty owed Harley-Davidson under that contract, for the fundamental reason that DFS is not a party to that contract and never was.

### C. Plaintiffs Have Failed to Demonstrate That They Lack Adequate Legal Remedies for Breach of Any Purported Contractual Obligations of DFS Concerning the Sale of the AW 2011-2012 Goods.

Insofar as the AW 2011-2012 Goods are concerned, the TRO enjoins sales of genuine HARLEY-DAVIDSON goods that (i) these Plaintiffs expressly approved and encouraged DFS to sell and distribute up through April 22, 2011, and (ii) these Plaintiffs expected and agreed would yield them specific percentage royalties as had been paid by DFS's former subsidiary, Elmec Sport S.A., for more than a decade prior to 2011. DFS denies that its re-sale of the AW 2011-2012 Goods can rightly be deemed a breach of the January 2010 Agreement, both because

DFS is not a party to that agreement and because Harley-Davidson, by arbitrarily and willfully refusing to receive production samples of the AW 2011-2012, acted in bad faith and waived any contractual right it might otherwise have had to receive those samples.[7]

At all events, Harley-Davidson's deep involvement in the design and manufacture of the AW 2011-2012 Goods (Zachariou Decl. ¶¶ 3-8); and Harley-Davidson's express approval of DFS's taking orders for AW 2011-2012 Goods prior to April 22, 2011 (*id*. ¶¶ 6-8); and Harley-Davidson's belated offer to approve the AW 2011-2012 Goods (Dabney Decl. ¶ 3 & Ex. 2); and Harley-Davidson's total failure to mention the AW 2011-2012 Goods in its application for Temporary Restraining Order, collectively provide overwhelming evidence that Harley-Davidson has fully adequate monetary remedies for any alleged breach of contract that it may succeed in proving after trial concerning DFS's sale of the AW 2011-2012 Goods.

The existence of adequate legal remedies is fatal to Plaintiffs' application for injunctive relief against the sale of the AW 2011-2012 Goods. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."). Harley-Davidson has pointed to no deficiency in the AW 2011-2012 Goods, any inability to calculate the royalties that Harley-Davidson initially agreed to accept on DFS's sale of those goods, any inability of DFS to

---

[7] "[T]he covenant of good faith and fair dealing is an implied promise contained in every contract 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *In re Estate of Denonville*, 2009 WL 2635150, 2 (Mich. App.) (quoting *Hammond v. United of Oakland*, 483 N.W.2d 652, 655 (Mich. App. 1992)). "Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." *Ferrel v. Vic Tanny Int'l, Inc.*, 357 N.W.2d 669, 672 (Mich. App. 1984) (quoting *Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678 (Mich. App. 1975)).

respond in damages, or any other basis on which litigants in past cases have been deemed to lack "adequate" legal remedies to as to justify issuance of specific performance of a contract.

### D. Insofar as It Enjoins DFS's Sale of the AW 2011-2012 Goods, the TRO Contravenes Principles of Equity and Should Be Dissolved.

Even if a moving party has a valid claim to some kind of relief, that does not mandate the grant of *equitable* relief. *See eBay, Inc. v. MercExchange*, *L.L.C.* 547 U.S. 388, 392 (2006) ("the creation of a right is distinct from the provision of remedies for violations of that right"). So for example, "[w]here . . . issuance of an injunction would subject the defendant to grossly disproportionate hardship, equitable relief may be denied although the nuisance be indisputable." *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 338 (1932).

Similarly, injunctive relief is properly denied where, as here, the compliance with an injunction would yield no benefit to the Plaintiffs, but would inflict a threat of costs that could be used to set up an "essentially extortionate transaction, a source of transaction costs not offset by any social benefit." *Youngs*, 243 F.3d at 393. *See also Dun v. Lumbermen's Credit Ass'n*, 209 U.S. 20, 22-24 (1909) (copyright plaintiff was properly refused injunction and remitted to a monetary remedy, where balance of hardships favored withholding injunction); *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 651 (7th Cir. 2002) ("It would be inequitable and indeed extortionate for a court to issue an order that allowed the power company to repair the canal at the canal company's expense if the repair would confer no value on the power company"); *Foster v. American Mach. & Foundry Co.*, 492 F.2d 1317 (2d Cir. 1974) (patent plaintiff was properly remitted to a monetary remedy where ordering a cessation of infringers' activity would not have been to the benefit of either party; stating that an injnction "is not intended as a club to be wielded by a patentee to enhance his negotiating stance").

The expanded record now shows that the TRO has inflicted millions of dollars in losses on DFS while yielding Plaintiffs no benefit whatsoever but, to the contrary, actually harming the Plaintiffs' brand interests in Greece and elsewhere. *See* the closed HARLEY-DAVIDSON store depicted in Exhibit 13 of the Declaration of Emmouil Zachariou. The TRO operated to prevent European HARLEY-DAVIDSON dealers and clothing stores from receiving genuine HARLEY-DAVIDSON merchandise they had ordered from DFS and that Harley-Davidson-approved factories had made and sold to DFS.

When the actual impact of the TRO is considered in the context of the AW 2011-2012 Goods, it is clear that the TRO is inequitable insofar as it prevents DFS from re-selling those goods as these Plaintiffs expected and encouraged to occur for many months until, starting in late July 2011, Plaintiffs sought to use a threat to destroy the value of the AW 2011-2012 Goods as an extra-legal means of coercing DFS to meet extra-contractual demands that Plaintiffs had made.

To characterize the Plaintiffs' position as "inequitable" is to put the matter kindly. The TRO should be dissolved as to the AW 2011-2012 Goods without prejudice to Plaintiffs' rights to seek royalties or other monetary remedies for alleged breach of any contract they may eventually succeed in proving existed between themselves and DFS.

## CONCLUSION

For the reasons set forth above, the TRO should be modified and vacated as set forth in the accompanying proposed Order.

Dated:  October 27, 2011

s/           James W. Dabney
James W. Dabney (E.D. Wis. Bar # 2211423)
Victoria J.B. Doyle (not yet admitted)
Attorneys for Defendant
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON, LLP
One New York Plaza
New York, New York 10004-1980
Telephone: 212-859-8000
Fax: 212-859-8584
James.dabney@friedfrank.com

8383722