**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**H-D MICHIGAN, LLC AND**
**HARLEY-DAVIDSON MOTOR COMPANY, INC.,**
      **Plaintiffs,**

    v.                                                       **Case No. 11-CV-00742**

**HELLENIC DUTY FREE SHOPS S.A.,**
      **Defendant.**

---

## DECISION AND ORDER

On August 5, 2011, plaintiffs H-D Michigan, LLC and Harley-Davidson Motor Company, Inc. sued defendant, Hellenic Duty Free Shops S.A., a Greek corporation, for breach of a trademark licensing agreement. Plaintiffs also requested a temporary restraining order ("TRO") enjoining defendants from, among other things, using plaintiffs' trademarks. I contacted defendant's New York counsel and asked him if he wished to participate in a hearing regarding plaintiffs' request for a TRO, and he declined to do so. Subsequently, I reviewed plaintiffs' submission and concluded that plaintiffs had satisfied the requirements for obtaining a TRO and, on September 6, 2011, I issued a TRO and placed a fourteen day time limit on it. Subsequently, plaintiffs asked me to extend the TRO until they could effect service on defendant. Because defendant refused to appear voluntarily, plaintiffs had to effect service under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. On September 19, 2011, I granted plaintiffs' request.

After plaintiffs effected service, I held a telephone conference with the parties' counsel to obtain their views on how best to proceed. I agreed to hold a hearing on whether the TRO should remain in effect and/or whether a preliminary injunction should issue at any time convenient to defendant. Defendant indicated that it needed time to engage in discovery and to otherwise prepare. Accordingly, I scheduled the matter for December 15, 2011 for a hearing on whether a preliminary injunction should issue. In the meantime, I kept the TRO in place.

Before me now is defendant's motion to modify or dissolve the TRO. Plaintiffs oppose the motion. Both parties have submitted affidavits and briefs in support of their positions. The relevant facts are as follows: on January 1, 2010, plaintiffs entered into a trademark licensing agreement with Elmec Sport S.A. ("Elmec") which was then defendant's subsidiary. Plaintiffs licensed Elmec to manufacture and sell clothing and accessories bearing certain Harley-Davidson trademarks. On December 31, 2010, Elmec merged with defendant and sent a notice of the merger to plaintiffs. The notice stated that, Elmec and defendant would henceforth "trade as a single entity" and that defendant would act as "full successor" of Elmec with respect to all contracts. (Decl. of Matt Thompson, Nov. 1, 2011 Ex. 1.) Plaintiffs claim that, after the merger, they discovered that defendant was selling unauthorized low-quality goods bearing the licensed trademarks through an unauthorized distribution channel, a chain of grocery stores. Thus, on April 22, 2011, plaintiffs notified defendant that they were terminating the licensing agreement.

Defendant first asks me to dissolve the TRO on the ground that the court lacks personal jurisdiction over it. Under Wisconsin law, a court can exercise personal jurisdiction over a party based on any of the grounds listed in Wisconsin's long-arm statute, Wis. Stat.

§§ 801.05, 801.04(2), or by consent. Kohler Co. v. Wixen, 204 Wis. 2d 327, 336 (Ct. App. 1996). Plaintiffs contend that this court has personal jurisdiction over defendant because defendant consented to such jurisdiction in § 16.2 of the licensing agreement.[1] Defendant responds that the licensing agreement is void because plaintiffs did not provide written consent to the transfer that arose out of defendant's merger with Elmec. Defendant points to § 14 which states that the agreement "may not be assigned, sublicensed, encumbered, or otherwise transferred . . . without the prior written consent of Licensor." (Decl. of Matt Thompson, Aug. 12, 2011 Ex. 1.) In interpreting the agreement, I apply Michigan law.[2]

I conclude that § 14 does not apply to the transfer. Section 10 of the agreement distinguishes between a transfer resulting from an assignment and a transfer resulting from a merger. Section 10.1(a)(v) describes the licensor's rights in the event the licensee "assigns or attempts to assign, sublicense, encumber, or otherwise transfer" the agreement, while § 10.1(c)(i) describes the licensor's rights in the event of a "merger, consolidation, acquisition, or change of ownership." As indicated, the transfer at issue resulted from a merger. While § 10.1(c)(i) gives the licensor the option of terminating the

---

[1] § 16.2 requires that "[a]ny and all disputes between the parties arising out of or relating to this Agreement shall be brought, heard and determined exclusively in either the Milwaukee County Circuit Court for the State of Wisconsin or the United States District Court for the Eastern District of Wisconsin, and Licensee consents to personal and subject matter jurisdiction and venue in such courts . . . ."

[2] § 16.1 reads: "This Agreement shall be construed in accordance with, and all disputes between the parties arising out of or relating to this Agreement shall be governed by, the laws of the State of Michigan, without regard to any choice of law principles." As a federal court sitting in Wisconsin, I look to Wisconsin choice-of-law rules to decide what law to apply to the contract. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941). Wisconsin choice-of-law rules permit the parties to select the law that will govern their contract. Bush v. Nat'l School Studios, Inc., 139 Wis. 2d 635, 642 (1987).

3

contract in the event of a merger, it does not require the licensor's prior written approval. In the present case, the licensor did not terminate the agreement. Therefore, defendant could and did assume Elmec's rights and duties under the contract, including the duty to consent to personal jurisdiction in this court.

Defendant's next argument is that I should dissolve the TRO to the extent that it enjoins defendant from selling its line of autumn-winter 2011-2012 Harley-Davidson clothing and accessories (the "AW line") because plaintiffs' breach of contract claim does not involve this line of goods and because plaintiffs have already approved it for sale. Plaintiffs disagree. Under § 4.2(a) and § 4.3(a) of the licensing agreement, defendant needs three approvals from plaintiffs before it can sell any goods bearing plaintiffs' trademarks: 1) approval of the concepts and artwork, 2) approval of the pre-production samples, and 3) approval of the production samples. Section 4.12 of the agreement gives plaintiffs "sole and exclusive discretion" as to whether to provide those approvals. Plaintiffs approved the concepts for the AW line in the fall of 2010 and the pre-production samples in January 2011. However, before the goods were delivered to defendant from Harley-Davidson-approved factories, plaintiffs concluded that defendant was selling unauthorized low-quality goods (not the AW line) through an unauthorized distribution channel and terminated the licensing agreement. Plaintiffs then declined defendant's request to review and approve the production samples for the AW line.

Defendant contends that it has a right to sell the AW line of goods because plaintiffs waived their right to approve the production samples by acting in bad faith. Defendant relies on a provision of Michigan contract law providing that when a party to an agreement has discretion as to whether to perform an act, it must exercise its discretion in good faith.

4

Ferrell v. Vic Tanny Int'l, Inc., 357 N.W.2d 669, 672 (Mich. Ct. App. 1984). Defendant contends that plaintiffs acted in bad faith because they knew defendant had outstanding orders for the AW goods but refused to approve the production samples in order to force defendant to disclose confidential business information. Plaintiffs acknowledge that they offered to approve the production samples if defendant would agree not to sell goods through unauthorized distribution channels, to only fill orders placed prior to termination of the agreement, and to provide plaintiffs with information concerning its sales of Harley-Davidson goods, sales that plaintiffs believed had been made in violation of the licensing agreement. Plaintiffs had repeatedly requested this information, and defendant had declined to provide it. Plaintiffs contend that such disclosure is required by § 6.1 of the agreement which provides: "Upon Licensor's request, Licensee shall submit to Licensor a written list of all customers of Licensee, together with information regarding sales of Licensed Products to each customer, including unit sales and volume by currency."

I conclude that it is reasonably likely that plaintiffs will be able to establish that they acted in good faith in refusing to review the production samples. I reach this conclusion because defendant appears to be violating the licensing agreement in several respects, including by refusing to provide plaintiffs with information about its sales, and because the agreement does not appear to bar plaintiffs from considering these apparent breaches in determining whether to approve the AW line production samples.

Defendant next contends that it has a right to sell the AW goods because once it received such goods from Harley-Davidson-approved factories plaintiffs' trademark rights in the goods were exhausted. This argument fails for several reasons. First, as discussed, the licensing agreement itself likely prevents defendant from distributing the goods at issue

5

because the approval process has not been completed. Second, plaintiffs do not appear to have exhausted their trademark rights. Under American law, a trademark owner's right to control branded goods is not exhausted until it has released the goods into the stream of commerce. Polymer Tech. Corp. v. Mimran, 975 F.2d 58, 61–62 (1992). In the present case, because they have not approved the production samples, plaintiffs are likely to be able to show that they have not yet placed the goods in the stream of commerce. European Union law is to the same effect.

Thus, after considering defendant's objection, I remain of the view that plaintiffs have satisfied the requirements necessary to obtain a TRO. As discussed, plaintiffs have established a reasonable likelihood of succeeding on the merits. In addition, they have shown that in the absence of injunctive relief they are likely to suffer irreparable harm and that their legal remedies are inadequate. If defendant sells AW goods in violation of its agreement with plaintiffs, plaintiffs would lose control over their trademarks and the value of the marks could depreciate. Even if defendant's products are of high quality, plaintiffs' reputation could still be endangered by defendant's actions. See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1092 (7th Cir. 1988). Monetary damages after the fact cannot restore the lost value of a trademark. Further, there is no evidence that injunctive relief will harm the public interest. Thus, I will deny defendant's motion to dissolve or modify the injunction set out in the TRO pending the December 15th hearing.

As a final matter, I must rule on defendant's motion to increase the amount of the bond plaintiffs have posted as security in this case. Defendant asks that the bond be increased from $10,000 to a little over $2.5 million. Fed. R. Civ. P. 65(c) requires plaintiffs

to provide adequate security to protect defendant in the event that it has been wrongfully enjoined, but plaintiffs claim that defendant is only entitled to the nominal bond already posted with the court. Plaintiffs point to the bond waiver in § 12 of the licensing agreement:

> [A]ny Licensed Articles . . . manufactured, advertised, promoted, used, distributed, or sold after the expiration or termination of this Agreement other than as authorized in sections 11.1 and 11.2 above shall be deemed counterfeit, and Licensor and HDM shall be entitled to equitable relief, including but not limited to a temporary restraining order, preliminary and permanent injunction, and specific performance, at nominal bond, with respect to any further violations of Licensor's and/or HDM's rights.

The problem with plaintiffs' argument is that the AW line cannot be sold because the production samples were never approved, not because the plaintiffs terminated the contract. In fact, defendant obtained part, if not all, of the AW line "to fill orders taken prior to the date of . . . termination," and § 11.1 of the agreement authorizes defendant to fill such orders. Therefore, § 12 does not limit the amount of the bond in the present case.

Plaintiffs also argue that a nominal bond is appropriate because the contract shields plaintiffs from liability for damages resulting from any failure to approve production samples. § 4.12 states that "[a]ll approvals under this Section 4 are within Licensor's sole and exclusive discretion and, therefore, Licensee shall have no rights against Licensor for damages or any other remedy as a result of Licensor's failure or refusal to grant any approval." While § 4.12 might shield plaintiffs from liability, it is possible that defendant will be able to prove that this provision is unenforceable or inapplicable to the present case. The goal of the security requirement is to protect the enjoined party should it prevail on the merits, even though the court has deemed that unlikely. Moreover, when setting the amount of a bond, it is better for a court to err on the high side because a bond amount that is too low will cause irreparable injury to the enjoined party. Mead v. Johnson & Co.

7

v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000). Therefore, I will order plaintiffs to post additional security with the court.

In requesting an increase in the amount of a bond, the burden is on the movant to prove that the increase is justified. See Equifax Svcs., Inc. v. Hitz, 905 F.2d 1355, 1362 (10th Cir. 1990); AB Electrolux v. Bermil Indus., 481 F. Supp. 2d 325, 337 (S.D.N.Y. 2007). Defendant has asked for an increase in the size of the bond for three reasons: 1) the AW goods have lost 70% of their €972,815 value because they cannot be sold in the intended season—a total loss of €680,970.50; 2) defendant will be liable for an additional €972,815 to dealers for lost profits on orders that it cannot fill (calculated based on a 100% mark-up); and 3) defendant has lost €135,000 in profits because it has been forced to close its own Harley-Davidson retail store. This adds up to roughly €1,800,000 or a little over $2.5 million. The only basis for these calculations is a list of its customers' orders for the AW goods amounting to a total wholesale value of €972,815 and estimates from one of its own employees. This evidence is somewhat speculative and insufficient to support a bond in the amount defendant requests. However, I will raise the bond to $1,000,000. Defendant may submit additional evidence, and I will consider increasing the bond.

Finally, I decline defendant's request to post the bond in Greece. Defendant has not presented a reason why a bond posted with this court would not protect its interests.

**THEREFORE, IT IS ORDERED** that defendant's motion to dissolve or modify the TRO is **GRANTED IN PART**. Plaintiffs shall file with the Clerk of this Court an additional undertaking in the form of a bond, check, or cash in the amount of $990,000. The Clerk of Court shall retain this security until further court order.

Dated at Milwaukee, Wisconsin, this 7th day of November 2011.

                                                    s/_____
                                                   LYNN ADELMAN
                                                   District Judge