UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

H-D MICHIGAN, LLC and
HARLEY-DAVIDSON MOTOR COMPANY, INC.,
    Plaintiffs,

v.                                    Case No. 11-CV-00742

HELLENIC DUTY FREE SHOPS S.A.,
    Defendant.

---

## DECISION AND ORDER

On August 5, 2011, plaintiffs H-D Michigan, LLC and Harley-Davidson Motor Company, Inc. sued defendant Hellenic Duty Free Shops, S.A., a Greek corporation, for breach of a trademark licensing agreement. After filing the lawsuit, plaintiffs moved for a temporary restraining order ("TRO") and a preliminary injunction enjoining defendant from selling trademarked goods or otherwise using plaintiffs' marks. On September 6, 2011, I granted plaintiffs' motion for a TRO. Defendant declined to participate in the hearing on the motion. On September 19, 2011, at plaintiffs' request I extended the TRO to give plaintiffs time to serve process on defendant in Greece under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. After defendant was served, I conferred with the parties and again extended the TRO because defendant indicated it would need time to engage in discovery before participating in a hearing on plaintiffs' request for a preliminary injunction. On December 15, 2011, I held a hearing on such request and now address the parties' contentions.

The relevant facts are as follows: On January 1, 2010, plaintiffs entered into a

trademark licensing agreement with Elmec Sport S.A. ("Elmec"), a subsidiary of defendant. Plaintiffs licensed Elmec to manufacture and sell clothing and accessories bearing Harley-Davidson trademarks. On December 31, 2010, Elmec merged with defendant and sent a notice regarding the merger to plaintiffs. The notice stated that Elmec and defendant would henceforth "trade as a single entity" and that defendant would act as "full successor" of Elmec with respect to all contracts. (Decl. of Matt Thompson, Nov. 1, 2011 Ex. 1.)

Under § 4 of the licensing agreement, defendant was permitted to distribute goods with plaintiffs' mark only after receiving three separate written approvals from plaintiffs. Plaintiffs had to approve the designs for the collection, the pre-production samples and the production samples. In late 2010, plaintiffs approved the designs for Elmec's collection of autumn-winter 2011-2012 apparel (the "AW collection"), and in January 2011, plaintiffs approved the pre-production samples. Defendant then took orders for the goods at the Harley-Davidson dealers convention in February 2011 and on March 23, 2011 advised plaintiffs that it was submitting orders to factories to begin manufacturing the collection.

Shortly thereafter, in April 2011, defendant began selling a different collection of goods subject to the licensing agreement, the "Essential Collection." Plaintiffs allege that the Essential Collection consisted of low-quality goods bearing plaintiffs' mark which plaintiffs had not approved, and that defendant was selling such goods through an unauthorized distribution channel, a German grocery store chain known as Penny Market. As a result, on April 14, 2011, plaintiffs notified defendant that they were "suspending approval of any products in concept, pre-production or production phases." (Decl. of Patrick Smith, Dec. 15, 2011 Ex. 3.) On April 15, defendant responded that in light of the suspension of approvals it "had no option but to put on hold, as of today, all our dealings

with you under the [licensing agreement]." (Id. Ex. 4.) On April 22, plaintiffs notified defendant that, because of defendant's breach, plaintiffs were terminating the agreement. In the termination letter, plaintiffs asked for a complete inventory of all licensed or unauthorized goods in defendant's possession, including all goods being manufactured for defendant by third parties, and a list of customers who had purchased either licensed or unauthorized products from defendant. Plaintiffs then sent a memo to Harley-Davidson motorcycle dealers stating that it had terminated its relationship with defendant but that orders placed prior to termination "should be delivered as anticipated." (Decl. of Emmanouil Zachariou, Oct. 27, 2011 Ex. 6.)

In response to the termination letter, defendant sent plaintiffs a list of items "in inventory as of May 24, 2011." (Prelim. Inj. Hr'g, Def.'s Ex. 5, 5A.) On June 6, June 23, and July 19, 2011, plaintiffs asked defendant to clarify whether this list included articles in the process of being manufactured by third parties, but defendant refused to provide any additional information. On July 22, 2011, defendant notified plaintiffs that it had completed production of the AW collection and submitted production samples to plaintiffs for approval. On July 26, 2011, plaintiffs advised defendant that it "should not be designing, manufacturing, promoting, selling, or distributing these products or any other products bearing any of Harley-Davidson's trademarks" and declined to review or approve the samples. (Id. Def.'s Ex. 9.) As a result, defendant remains in possession of the AW collection and has not filled the orders placed at the dealers convention.

To justify a preliminary injunction, plaintiff must prove that "it is reasonably likely to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law,

3

and an injunction would not harm the public interest." Christian Legal Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006). To prove that they are likely to succeed on the merits, plaintiffs must demonstrate that defendant is bound by the terms of the licensing agreement, that plaintiffs rightfully terminated the agreement and that the agreement prohibits defendant from selling the AW collection. In interpreting the agreement, I apply Michigan law. [1]

First, I find that plaintiffs are likely to prove that the licensing agreement was binding on defendant. Defendant disputes this, arguing that plaintiffs failed to provide prior written consent to the transfer of the agreement resulting from defendant's merger with Elmec. Defendant points to § 14 of the agreement, which states that it "may not be assigned, sublicensed, encumbered, or otherwise transferred . . . without the prior written consent of Licensor." (Prelim. Inj. Hr'g, Def.'s Ex. 1.) However, § 14 is likely inapplicable to the transfer at issue here. This is so because § 10, which is more specific and detailed than § 14, distinguishes between transfers resulting from mergers and other transfers, i.e. those described in § 14. Section 10.1(c)(i) specifies that when a transfer of the agreement results from a "merger" the licensor may terminate the contract, but it does not contain a prior written consent requirement. Prior written consent is required only when the transfer does not result from a merger. (See § 10.1(a)(v).) In the present case, the transfer of the

---

[1] Section 6.1 of the contract reads: "This Agreement shall be construed in accordance with, and all disputes between the parties arising out of or relating to this Agreement shall be governed by, the laws of the State of Michigan, without regard to any choice of law principles." As a federal court sitting in Wisconsin, I look to Wisconsin choice-of-law rules to decide what law to apply to the contract. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941). Wisconsin choice-of-law rules permit the parties to select the law that will govern their contract. Bush v. Nat'l School Studios, Inc., 139 Wis. 2d 635, 642 (1987).

4

contract to defendant resulted from a merger. Thus, the transfer took effect unless plaintiffs terminated the contract, which they did not.[2]

Next, I conclude that plaintiffs are likely to prove that defendant breached the contract by selling the Essential Collection. On September 24, 2010, defendant asked plaintiffs to approve the designs for the collection. Plaintiffs submit an affidavit stating that in October 2010 they denied this request. Defendant does not dispute this assertion. Defendant also does not dispute that it sold the collection and that it did so through an unapproved distribution channel. Thus, plaintiffs are likely to prove they had a right to terminate the contract and that they did so through their April 22, 2011 letter.

Further, plaintiffs are likely to prove that the licensing agreement prohibited defendant from selling the AW collection. Under § 4.11,

> Licensor reserves the right to suspend the approval process outlined above and action on any pending request or submission by Licensee for approval once Licensor has given notice to Licensee of any breach of this Agreement until Licensee cures the breach or the matter is otherwise resolved to Licensor's satisfaction.

On April 14, 2011, plaintiffs advised defendant they were "suspending approval of any products in . . . production phases" because defendant had breached the contract by selling the Essential Collection. Defendant acknowledged the suspension. A week later, plaintiffs terminated the contract. While the termination letter references § 11.1 of the contract, which permits defendant to continue manufacturing goods to fill orders taken prior

---

[2]Defendant's duties under the contract include the duty to consent to personal jurisdiction in this court. Section 16.2 of the agreement states: "Any and all disputes between the parties arising out of or relating to this Agreement shall be brought, heard and determined exclusively in either the Milwaukee County Circuit Court for the State of Wisconsin or the United States District Court for the Eastern District of Wisconsin, and Licensee consents to personal and subject matter jurisdiction and venue in such courts . . . ."

5

Case 2:11-cv-00742-LA    Filed 12/20/11    Page 5 of 10    Document 69

to termination, it also makes clear that in plaintiffs' view § 11.1 "applies only to authorized and approved licensed products." (Decl. of Matt Thompson, Aug. 12, 2011 Ex. 6.) The production samples for the AW collection had not yet been approved. Therefore, as of April 22, defendant knew that it could no longer manufacture the AW collection. Defendant argues that the April 25 memo from Harley's Dealer Communications Section advising dealers of the problems with defendant and stating that orders placed prior to termination should be delivered as anticipated somehow countermanded plaintiffs' suspension of approvals. I disagree. The memo was not directed to defendant but rather to third parties. Moreover, it stated that the details surrounding the termination were still being worked out. Plaintiffs clearly hoped that such details would be worked out but ultimately they were not.

Probably the principal reason that the problems were not worked out was that after April 25 defendant likely breached the contract several more times by failing to provide plaintiffs with information about its customers and sales as required by the contract. In the termination letter and several times thereafter, plaintiffs asked for information on all sales of Essential Collection goods and any other unapproved goods and for a list of customers to whom defendant had sold either licensed or unauthorized goods. Section 6.1 of the contract required defendant to submit to plaintiffs "a written list of all customers of Licensee, together with information regarding sales of Licensed Products to each customer" upon plaintiffs' request. While § 17.7 states that § 6.1 does not survive termination of the agreement, these requests were initially made prior to termination. Additionally, on July 19, 2011, plaintiffs notified defendant of their intent to visit defendant's offices to inspect records kept in connection with the sale of goods bearing plaintiffs' marks. Section 3.5 requires defendant to maintain "accurate books of account and records

6

covering all transactions relating to the Licensed Articles" for two years following termination, and plaintiffs are allowed to come on-site to inspect these books. Defendant refused to allow the inspection.

Based on these facts, plaintiffs likely had a right under the contract to decline to review or approve the production samples for the AW collection, and § 4.3 prohibits defendant from selling the collection without plaintiffs' approval. While Michigan contract law implies a covenant of good faith and fair dealing in every contract, plaintiffs are likely to succeed in proving they acted in good faith. Ferrell v. Vic Tanny Int'l, Inc., 357 N.W.2d 669, 672 (Mich. Ct. App. 1984). When terminating the contract, plaintiffs repeatedly asked for information on goods being manufactured, but defendant did not respond until three months later when it had finished manufacturing the AW collection.

In addition to establishing a likelihood of success on the merits, plaintiffs have shown that in the absence of injunctive relief they are likely to suffer irreparable harm and that their legal remedies are inadequate. If defendant sells the AW line in violation of its agreement with plaintiffs, plaintiffs will lose control over their trademarks. Even if a plaintiff fails to demonstrate a business loss, the law presumes that injuries arising from trademark infringement are irreparable because plaintiff's reputation is being imperiled by the acts of another. Re/Max North Cent., Inc. v. Cook, 272 F.3d 424, 432 (7th Cir. 2001). This type of injury has no adequate remedy at law because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 16 (7th Cir. 1992).

The benefit to plaintiffs and the public also outweighs the potential harm an injunction would do to defendant. I use a sliding scale to weigh the balance of harms. The greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. Judge v. Quinn, 612 F.3d 537, 546 (7th Cir. 2010). Plaintiffs have a significant likelihood of success on the merits. If I grant an injunction defendant will need to pay either to store or to destroy the AW collection, and it will not be able to fill the orders placed for the collection. However, plaintiffs have submitted affidavits from at least three dealers who voluntarily cancelled their orders for the AW collection, and by this late date in the fall season, defendant has already broken most of the original contracts for the goods. Further, an injunction would serve the public interest by preventing consumer confusion. Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d 808, 813–14 (7th Cir. 2002). Therefore, I will issue a preliminary injunction.

Pursuant to Fed.R.Civ.P. 65(c), plaintiffs must post security with the court in order to support the injunction and cover the damage to defendant in the event defendant has been wrongfully enjoined. For the reasons already stated in my orders dated November 7, 2011 and November 17, 2011, which addressed the bond for the TRO, I will order plaintiffs to maintain the $1.8 million bond they have already posted with the court.

**THEREFORE, IT IS ORDERED** that plaintiffs' motion for a preliminary injunction [Docket # 5] is **GRANTED**. Defendant and its employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, joint ventures, distributors, dealers, and all persons in active concert or participation with any

of them who receive actual notice by personal service or otherwise are hereby **ENJOINED** from:

1. Manufacturing, assembling, distributing, promoting, advertising, and selling any products or associated tags, labels, packaging, containers, displays, and any other materials bearing any of the Licensed Trademarks or variations thereof;

2. Using any of the Licensed Trademarks or variations thereof in any manner on or in connection with any products or associated tags, labels, packaging, containers, displays, and any other materials;

3. Representing by any means whatsoever, directly or indirectly, that defendant, any products offered by defendant, or any activities undertaken by defendant are sponsored or licensed by plaintiffs, or are otherwise associated or connected in any way with plaintiffs, or that the Agreement is still in effect;

4. Destroying, altering, secreting, transferring, or otherwise disposing of (or allowing to be destroyed, altered, secreted, transferred, or otherwise disposed of) any artwork, products, pre-production and production samples of products, means for making products, advertisements, promotional materials, sales and accounting records, letters, emails, files, and documents (whether on paper, in electronic format, or on any other medium) relating to: (a) the Licensed Trademarks, (b) the Agreement, (c) the manufacture, sales, or promotion of products bearing the Licensed Trademarks or variations thereof to or by Penny Market grocery stores, (d) the manufacture, sales, or promotion of products bearing the Licensed Trademarks or variations thereof to or by Real grocery stores, or (e) the claims and allegations asserted by plaintiffs in their complaint in this action;

9

5. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs 1 through 4 above.

**IT IS FURTHER ORDERED** that the Clerk of this Court shall maintain until further court order the security already posted by plaintiffs in the amount of $1.8 million to cover the costs and damages as may be suffered or sustained by any party who is wrongfully restrained.

Dated at Milwaukee, Wisconsin, this 20th day of December, 2011.

s/_____
LYNN ADELMAN
District Judge